UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

SunOpta Grains and Foods Inc.,             Civ. No. 17-1607 (PAM/HB)

Plaintiff,

v.             **MEMORANDUM AND ORDER**

JNK Tech Inc. d/b/a Salitek; Cherith
Agro, Inc. f/k/a JP Agro Trading, Inc.,
and Abraham T. "Tim" Kim,

Defendants.

---

This matter is before the Court on Plaintiff's Motion for Summary Judgment. (Docket No. 57.) For the following reasons, the Motion is granted.

**BACKGROUND**

Plaintiff SunOpta Grains and Foods, Inc. develops, produces, and supplies soybeans. Defendants JNK Tech, Inc. d/b/a Salitek ("JNK") and Cherith Agro, Inc. ("Cherith") are both founded, owned, and operated by Defendant Abraham T. "Tim" Kim. Kim founded JNK in 2006 to import big-screen televisions from China and Korea to the United States. He later attempted to repurpose JNK to export soybeans, eventually forming Cherith for that purpose instead. At the beginning of the parties' dealings, Kim was still using JNK for his soybean transactions.

In late 2015 and early 2016, SunOpta entered into two contracts for the sale of medium and small size soybeans to JNK. These contracts required germination rates of 85% for the medium soybeans and 90% for the small soybeans. SunOpta began attempting to fill Kim's orders.

In early 2016, SunOpta was developing a backlog at their warehouse ("FG Transload") of soybeans that failed to meet the contracts' germination requirements. Both SunOpta and Kim were involved in testing the germination rate of the soybeans, and while the beans always tested at over 80% germination, many loads failed to reach the 85% threshold. SunOpta emailed Kim, asking if he was willing to purchase the failed loads. Kim told SunOpta representatives that he could help with the backlog, stating "I am sure I could move them [70-85% germination] to the soy meal market" (Dalton Decl. (Docket No. 60) Ex. 3) and "I am going to move all soybeans to end users at current price. . . even though they failed to pass inspection." (Id. Ex. 9.) Kim then arranged for a shipment of 46 loads of germination-failed soybeans from FG Transload to Korea. However, the shipment never occurred because Kim repeatedly delayed the shipping date, claiming he was having a hard time finding buyers.

Kim emailed SunOpta on July 6, 2016, stating that market conditions and low germination rates prevented him from selling the soybeans from FG Transload at the current price. Kim told SunOpta he could sell 500 metric tons of the germination-failed soybeans to a Chinese buyer if SunOpta reduced its price. Through email exchanges, SunOpta eventually agreed to the quantity, shipping date, and price. The parties made no mention of required germination rates. SunOpta shipped the soybeans in mid-July and sent Kim invoices and packing slips in early August. While the paperwork sent to Kim did not mention germination rates, it did describe the soybeans sold as "for sprout." (Knutson Decl. (Docket No. 64) Ex. A at 59.) These forms were all addressed to Cherith rather than JNK. The soybeans arrived in China on August 15 and August 22, 2016.

2

Cherith failed to pay in September 2016 as the parties agreed. Kim emailed SunOpta several times requesting extensions on the payment date, claiming that he failed to sell the soybeans due to market conditions. This continued until November 22, 2016, when SunOpta demanded payment and Kim complained that the soybeans suffered from "extremely bad germination" rates of around 65%. (Id. at 79.) Kim attempted to settle the contract price, $278,451.25, for $160,000. SunOpta countered at $240,000. When Kim did not agree, SunOpta initiated this litigation.

**DISCUSSION**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence and inferences that "may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Enter. Bank v. Magna Bank of Mo., 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

SunOpta seeks summary judgment on all of its claims: (1) breach of contract; (2) action for the price; (3) account stated; (4) unjust enrichment; and (5) promissory estoppel. SunOpta further asserts that piercing the corporate veil under an alter-ego theory is appropriate, making Kim personally liable for the contract price. Defendants respond that

3

there are genuine issues of material fact as to their counterclaims, which preclude summary judgment. Defendants' counterclaims are: (1) revocation of acceptance; (2) breach of express warranty; and (3) breach of the implied warranties of merchantability and fitness for a particular purpose. Because this case involves a sale of goods for more than $500, the UCC applies.

## A. Defendants' Counterclaims

Defendants do not contest that the parties formed a new contract in July 2016. Rather, Defendants argue that summary judgment is inappropriate because Cherith effectively revoked its acceptance of the soybeans when it discovered the beans had low germination rates in November 2016. Minnesota law provides in relevant part:

> (1) The buyer may revoke an acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to the buyer if it was accepted
>
> …
>
> (b) without discovery of such nonconformity if the acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

Minn. Stat. § 336.2-608.

Defendants argue that the soybeans they received from SunOpta in August had germination rates of only 65%. They claim that such a low germination rate substantially impairs the value of the soybeans making Cherith's revocation of acceptance proper. Further, Defendants claim that the revocation was timely because the poor germination of

4

the soybeans was not readily apparent on inspection when the beans arrived in China. Defendants also claim that SunOpta breached an express warranty that the soybeans would satisfy at least 80% germination rates based on use of the term "for sprout" on the invoice and packing slips SunOpta sent Kim. In the alternative, Defendants argue that the low germination rate of 65% constitutes a breach of either the implied warranty of merchantability or the implied warranty of fitness for a particular purpose.

Defendants claims fail because there is no genuine issue of material fact as to the germination rates of the soybeans SunOpta shipped to Cherith in August 2016. To avoid summary judgment, an opposing party "may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. Defendants have merely alleged that the soybeans SunOpta sent to China had germination rates around 65%. Defendants failed to allege a poor germination rate until the soybeans had been in Cherith's control for three months, and there is no documentary evidence in the record showing that the soybeans reliably tested at a germination rate of 65% when they arrived in China. Defendants have merely produced an email from Kim stating that the germination was poor, and photos of soybeans from November 2016, neither of which establish a germination rate. Conversely, SunOpta has provided ample documentary evidence showing that the soybeans at issue all tested above 80% germination while in their control, that Kim personally selected the loads he wanted shipped, and that Kim was aware that soybeans are perishable products whose germination can worsen during shipment, especially in the summer months. (See 2d Dalton Decl. (Docket No. 66) Ex. 59); (Dalton Decl. Ex. 17.)

5

Additionally, Kim failed to revoke his acceptance before any "substantial change in condition of the goods" could occur. Minn. Stat. § 336.2-608(2). Kim did not complain of poor germination rates until the soybeans, a perishable product, had been in his control for three months. The soybeans' germination rates after three months of unknown storage and transport are not attributable to SunOpta and fail to satisfy the requirements of § 336.2-608.

Defendants' warranty arguments are also unpersuasive. It makes no difference whether the term "for sprout" in SunOpta's documentation created an express or implied warranty, because Defendants have failed to present evidence that SunOpta breached any such warranty. The record evidence shows that the parties both knew that they were dealing with lower germination-rate soybeans, and that Kim intended to sell the failed soybeans to the meal market rather than for sprout. (Dalton Decl. Ex. 3.) Additionally, Defendants argue that the term "for sprout" referred to "germination rates of greater than 80%." (Defs.' Opp'n Mem. (Docket No. 62) at 6.) As discussed above, the unrebutted facts establish that the soybeans tested at 80% or above while in SunOpta's control and that Kim was aware the soybeans may deteriorate during shipment. (Delton Decl. Ex. 17.) Further, Kim did not test the germination rates when the soybeans arrived in China, and there is no evidence that the soybeans were nonconforming on arrival.

Defendants rely on mere allegations of low germination rates. This is insufficient when the only evidence in the record is the contractually sufficient germination rate when the soybeans left SunOpta's control. Summary judgment is appropriate.

**B.	Plaintiff's Claims**

**1.	Breach of Contract**

"A breach of contract claim has four elements: '(1) formation of a contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of the contract by defendant; and (4) damages.'" St. Jude Med., S.C. v. Biosense Webster, Inc., 994 F. Supp. 2d 1033, 1043-44 (D. Minn. 2014) (Montgomery, J.) (citation omitted).

The parties' emails in July 2016 were sufficient to create a contract. These communications specified that the parties were forming an entirely new agreement, including a new product, new quantity, new price, new shipment destination, and no germination requirement. Defendants have not contested that a new contract was formed in July 2016. The element of contract formation is satisfied.

The other requirements for a breach-of-contract claim are met as well. Defendants do not contest that SunOpta fulfilled its obligations by shipping and delivering the soybeans. They contend instead that the soybeans failed to meet the necessary germination rate, established by the parties' prior dealings and use of the term "for sprout." As discussed above, that argument is unpersuasive and SunOpta has adequately performed its conditions precedent.

The record also shows that Defendants breached the contract and owe SunOpta the contract price. Under the UCC, "pay[ing] in accordance with the contract" is an obligation of every sale-of-goods contract and failure to do so constitutes breach. See Minn. Stat. § 336.2-301; see also id. § 336.2-703. In his deposition Kim admitted that payment was due in September 2016, and that he failed to make such a payment. Therefore, Defendants

materially breached the contract and SunOpta is entitled to a remedy. The damages in this case are the funds due on the July contract, specifically $278,451.25.[1]

Because all four elements for a breach of contract claim are present, and Defendants have no defenses to their breach, SunOpta is entitled to summary judgment on its breach-of-contract claim.

### 2. Action for the Price

SunOpta also seeks summary judgment on its claim of action for the price, a seller's remedy under the UCC. When a buyer fails to pay the price as it becomes due the seller may recover, together with certain incidental damages, the price of accepted goods. Minn. Stat. § 336.2-709(1). Because Defendants accepted the soybeans once they arrived in China and failed to pay for them, action for the price is an appropriate remedy. Defendants concede that SunOpta's interpretation of the statute and its application to this case are correct. (Defs.' Opp'n Mem. at 18.) Because the Court has rejected Defendants' revocation-of-acceptance counterclaim, summary judgment on this claim is proper.

### 3. Account Stated

Additionally, SunOpta seeks summary judgment under the doctrine of account stated. SunOpta argues that this remedy is appropriate because it sent invoices to Kim in August 2016 and he did not object to them within a reasonable time.

---

[1] Defendants contend that SunOpta's alleged breach of express and implied warranties should reduce the amount due. This argument is without merit, as discussed above.

"An account stated is 'a manifestation of assent by a debtor and creditor to a stated sum as an accurate computation of an amount due the creditor.'" Mountain Peaks Fin. Servs., Inc. v. Roth-Steffen, 778 N.W.2d 380, 387 (Minn. Ct. App. 2010) (citation omitted). "If one side proffers a 'statement' of an account between the parties, the other side's retention of it without objection for an unreasonable amount of time constitutes prima facie evidence of the accuracy of the account that has been set forth." Egge v. Healthspan Servs. Co., No. 00cv934, 2001 WL 881720 at *5 (D. Minn. 2001) (Montgomery, J.). Finally, "[t]o establish and recover on an account stated, the claimant must show (1) a prior relationship as debtor and creditor, (2) a showing of mutual assent between the parties as to the correct balance of the account, and (3) a promise by the debtor to pay the balance of the account." Mountain Peaks Fin. Servs., 778 N.W.2d at 387.

Defendants do not dispute that elements (1) and (3) of SunOpta's account-stated claim are satisfied. Defendants argue that Kim's objection to the germination rates in November 2016 constitutes an objection to the balance that precludes an account stated, and that the objection was made within a reasonable time because Kim had not previously discovered the soybeans' poor germination.

However, once again Defendants have failed to cite to any record evidence to establish a genuine issue of material fact on this claim. Kim's objection to the quality of the soybeans does not qualify as an objection to the amount he owed on the account stated. Indeed, Kim never objected to the amount he owed SunOpta, even when repeatedly asking for extensions on his payment due date. (See Dalton Decl. Ex. 1 at 256-59.) Even when Kim objected to the germination rates of the soybeans in November 2016, he still asked

SunOpta for two more weeks to try to sell them. (Id. at 259.) At that time, he did not try to negotiate a lower price for the beans or challenge the validity of the parties' agreement.

Kim had possession of the soybeans and invoices for more than three months, and only now during litigation does he object to the amount owed. There is no genuine issue of fact that Kim failed to object to the account stated, and summary judgment on SunOpta's claim of account stated is proper.

### 4. Other Contract Remedies

Because the parties had an enforceable contract, SunOpta's alternative claims of breach of unjust enrichment and promissory estoppel are moot.

### 5. Prejudgment and Postjudgment Interest

SunOpta requests prejudgment interest at 6% per annum, relying on Woods v. K.R. Komarek, Inc., No. 15cv4155, 2017 WL 2312868, at *7 (D. Minn. May 26, 2017) (Doty, J.) (stating that prejudgment interest at the 6% rate applies to breach-of-contract claims). SunOpta also requests postjudgment interest under 28 U.S.C. § 1961(a). Postjudgment interest is based on the weekly average 1-year constant maturity Treasury yield and applies to "any money judgment in a civil case recovered in a district court." Id. An award of both prejudgment and postjudgment interest is appropriate.

### 6. Piercing the Corporate Veil

Finally, SunOpta asks this Court to pierce the corporate veil on an alter-ego theory, finding Kim personally liable for the debts of his corporations.

"When using the alter ego theory to pierce the corporate veil, courts look to the 'reality and not form, with how the corporation operated and the individual defendant's

relationship to that operation.'" Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C., 736 N.W.2d 313, 318 (Minn. 2007) (citation omitted). Factors relevant here include: "insufficient capitalization . . . failure to observe corporate formalities, nonpayment of dividends . . . siphoning of funds by dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and existence of corporation as merely facade for individual dealings." Victoria Elevator Co. v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979).

Neither JNK nor Cherith have any corporate documents other than their articles of incorporation. (Pl.'s Supp. Mem. (Docket No. 59) at 13). Additionally, JNK and Cherith transferred thousands of dollars to one another, without sufficient corporate documentation regarding the method and purpose of these transfers. (Dalton Decl. Ex. 39.) Further, Kim admitted in his deposition that he used Cherith funds to pay JNK employees. (Dalton Decl. Ex. 1 at 70.)

Kim is also the sole shareholder of JNK and Cherith and he and his wife are the only employees. His deposition shows that he used corporate money to pay his wife's personal expenses, give money to his church, cover his son's school tuition, and pay property taxes on his home. (See Dalton Decl. Ex. 1 at 58); (see generally Kim Aff. (Docket No. 63.)) He also made several withdrawals of corporate funds to "cash" without further explanation. (See Dalton Decl. Ex. 31.) Further, Kim clearly had insufficient capitalization to undertake these kinds of ventures; he explicitly told SunOpta that he could not afford the contract price and initially capitalized Cherith with only $5,000. (Defs.' Opp'n Mem. at 13.) Kim filed a Declaration that contradicts his deposition testimony and alleges several innocent

reasons for his abuse of the corporate form. (See Kim Aff. (Docket No. 63.)) However, a defendant cannot create a fact issue by submitting an affidavit that contradicts prior sworn deposition testimony. See Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983). The record reflects that Kim violated many of the Victoria Elevator factors for alter-ego liability through his handling of JNK's and Cherith's corporate structures and funds.

Victoria Elevator also requires that there be an element of unfairness or injustice to pierce the corporate veil. Victoria Elevator, 283 N.W.2d at 512. "[E]vidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented." Groves v. Dakota Printing Servs., Inc., 371 N.W.2d 59, 62-63 (Minn. App. 1985). It would be unfair and unjust to decline to pierce the corporate veil here, as Kim showed little respect for the corporate form and failed to capitalize his business such that he could satisfy the amount he owed SunOpta. Thus, this Court will pierce the corporate veil and hold Kim personally liable on the contract price.

**CONCLUSION**

SunOpta has established that there is no genuine issue of material fact surrounding the formation of the parties July 2016 agreement. Defendants' have failed to demonstrate any factual issue on their counterclaims instead relying on Kim's bare allegations. Accordingly, **IT IS HEREBY ORDERED that**:

1. Plaintiff's Motion for Summary Judgment (Docket No. 57) is **GRANTED**;

2. Plaintiff is awarded damages in the amount of $278,451.25 plus prejudgment interest at the rate of 6% per annum from October 1, 2016 through the entry of judgment, and postjudgment interest at the prevailing federal rate;

3. Defendant Abraham T. "Tim" Kim is personally liable for Plaintiff's damages.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: November 19, 2018

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge